Good morning, Your Honors. May it please the Court, my name is Susan Solomon and I'm pro bono counsel for the petitioner here, Concepcion Hernandez Donis. Your Honors, we're here today because an individual who fled torture in Guatemala over 15 years ago, who has no contacts in Guatemala other than the people who persecuted him, and who now faces even more danger in Guatemala than he did when he fled, is nonetheless about to be deported to that country. Counsel, is it correct that there's nothing before us at this point except Convention Against Torture Relief? Correct. Deferral of removal under the Convention Against Torture. Now the test on that is not whether substantial evidence would support Hernandez's claim, but whether there's substantial evidence in the record taken as a whole that would support the BIA's determination. Correct. Why isn't the country report sufficient on that? Well, Your Honor, for two reasons. One, that there's more than one basis on which Mr. Hernandez Donis would be tortured. Not simply the fact that he is a gay man, but also the fact that he is a gay man who identifies as a woman, which is a separate social group that experiences discrimination as this Court has recognized Hernandez Montiel. Also, the third reason would be the past persecution. And that has been kind of taken out of the picture by this adverse credibility determination. So the Court... On Convention Against Torture, you don't get a shifting presumption for past persecution, do you? Right, Your Honor, but it is part of the overall picture, and the BIA had the obligation... I know it would be for asylum, you'd get a shifted presumption because of past persecution. But for Convention Against Torture, I just thought he had to show a sufficient likelihood that he'd be tortured. Correct. But the BIA had to consider the aggregate grounds on which he would be tortured, not simply one ground in isolation. And there are multiple grounds here on which he risks being tortured, including the reprisals that... Does it matter for something like this that no one has it in for him personally such that they'll torture him because they read on a passenger manifest that so-and-so came back, the way it might be, oh, for a politician on the wrong side of a tyrannical regime? He can put on dresses in his living room and be in trouble with bad people. Does it matter for the Convention Against Torture that it's avoidable that way? This Court recognized in Hernandez-Montiel that sexuality and sexual identity are inherent and that a person shouldn't have to change them in order to avoid torture. He doesn't have to change them, but gosh, I wear a suit to go to work and I wear blue jeans at home. Doesn't have anything to do with any deep identity issues. It's just we're different clothes for different circumstances. Well, Your Honor, it's not just the fact that my client prefers to dress as a woman. It's the fact that demeanor, mannerisms, vocal inflections, all of these things make it clear to observers. When my client goes to the store to buy an orange, and at talks to the cashier, interacts with the cashier. Your time's short is the reason I'm interrupting you. I've got a different problem with this case, which is I'm not sure how the I.J., the second time through, the second I.J., would have decided the case had he believed your client. He's got an adverse credibility finding. And my client, I.J., who was the first federal official to find that he was a liar, never heard him testify. Your client asked to testify, and the I.J., with the argument, based on the argument of the government, refused to let him testify. That's what bothers me. So what law do you have that tells us that there was a violation of his rights when the adverse credibility finding is entered by an I.J. who never heard him, never heard cross-examination, and so on? Well, in terms of the due process issue, this is analogous to cases like Cana Meridia or Campos Sanchez, where the person before the I.J. was originally actually questioned by an I.J. who didn't put the relevant inconsistencies before that person. And then the person then has no notice of the issues that he's required to address. And what was in front of Mr. Hernandez at the initial hearing when he was allowed to testify? What I'm after is partly demeanor and so on, but now what I'm after is the point that you raise, which I think is an important one. We do have law that says if there's going to be a violation of the I.J.'s rights, there's going to be a violation of the I.J.'s rights. So what the problems are to which you are responding, is there anything new in the second hearing, that is to say the hearing after remand, as to which he did not have a chance to respond or notice that he should have responded in the first hearing, the hearing in which he actually spoke? In fact, Your Honor, all of the grounds for or all of the identified inconsistencies that the BIA upheld that underlayed the I.J.'s reasoning, all of those were new in terms of being explicitly put to Mr. Hernandez-Doniz. None of those grounds were explicitly put to Mr. Hernandez-Doniz at the first hearing. Okay. You've got a qualifier in there when you say explicitly. What do you mean by that? I mean that there may have been a sentence in the middle of a paragraph-long monologue by the I.J. not framed as a question. For example, I would refer the Court to the record at pages 417 through 418. The I.J. in the original merits hearing there goes into a long question, actually I think it probably, well, actually it starts on 417, and talks about, okay, you say this, you say this, you say this, and then my client answers, yes, and then he says, okay, that had nothing to do with your family, you say that you were gang-raped, you say that you're homosexual, and then goes on and on and on about his sexuality and then says, why do you think things will happen? There never is a direct, there's a long series of statements that are never framed in the question. So the words are there, and based on a record sitting quietly at a desk many months later, it may appear that the judge mentioned these things, but the fact that they were mentioned in the midst of a long sort of lecture... And that judge, the one who mentions them, did not enter an adverse credibility finding. That's correct, Your Honor. That judge acted on the presumption that he was telling the truth. That's correct, Your Honor. He never made an adverse credibility finding. So if the record we have is the record we have, and there was no violation of his rights and he's not being allowed to testify, I have to say that there's enough evidence in the record here to support the decision. But my problem is only on the question as to whether or not in entering an adverse credibility finding under these circumstances, Mr. Hernandez should have been allowed to speak when he specifically asked to speak. Now, I know he's incarcerated. Is the custom for incarcerated detainees or aliens that they get to appear in person or do they appear by telephone? In both instances, he appeared in person. And if he had been allowed to speak at the second hearing, would he have been allowed to come in in person? Was that the issue, or would he have been coming in by telephone? He was physically present in the courtroom when the judge denied him the opportunity to testify. So it would have been a testimony in which he would have been there, subject to cross examination, subject to observation of demeanor and so on? Yes, Your Honor. Okay. Am I remembering correctly that what the country report says, and it's not contradicted by any other evidence, is that there's hostility to homosexuals in Guatemala. Occasionally, thugs will beat up a homosexual or a transvestite homosexual on the street. But the government does not condone that, and the government prosecutes people that it catches who do that? That's not quite the full picture, Your Honor. There is indication in the record that perhaps the government is not aggressively investigating these matters because people never seem to be caught. And second, there is evidence in the record that police officers actually commit some of these offenses. For example, there was an incident in late 2005 where individuals dressed in police uniforms, riding police bikes, motorcycles, excuse me, Your Honor, assaulted and killed one transgender person and grievously wounded the other. The perpetrators have never been brought to justice in that case. There's another case in early 2006. I believe there were five transgendered individuals who were assaulted. Is there evidence of government policy as opposed to just some bad cops? The fact that there is no – there seem to be no prosecutions unless the victims are American journalists. Try to get a prosecution in San Francisco if somebody steals your camera. Well, I would think that a human life is worth more than a camera, Your Honor. Certainly it is. And certainly we would prosecute that more vigorously. But I thought you were talking about failure to prosecute on account of people beating other people up. Or people died. I mean, there were two individuals, two transgender individuals, one in 2005 and one in 2006 who died. The government claims those are being investigated when confronted by international observers, certainly, but there's no evidence that anyone's ever been caught and no one's ever been brought to justice. And these are, you know, not new events. Also, there's no pressure on the government to prosecute these crimes because of the systemic discrimination against homosexuals and especially men who are effeminate in Guatemala. So there's not really – other than outsiders, there's not really anyone to pressure the government to take action in these cases. Okay. We've taken you a little bit over. Let's hear from the government. But we'll give you a chance to respond. Thank you. May it please the Court, my name is Michelle Sarko. I'm here representing Attorney General Eric Holder in this matter. Just as a preliminary matter, I'd like to preserve an issue for the Court for further review. This Court's case law is that it does have jurisdiction to review a CAT claim in the situation where the alien has committed an aggravated felony and that the jurisdictional bar at 8 U.S.C. 1252-A2C does not preclude the Court from having jurisdiction. It's the government's viewpoint that that's not correct, that the Court doesn't have jurisdiction, but we recognize the Court's case law and just preserve it for further review. Okay. In other words, you're kind of hoping the Supreme Court's going to reverse us on that at some point? Maybe even in this case. No comment. No, no, no. Fair enough. No, you get to do that. That's exactly what you're supposed to do. Okay. That was not a hostile question from my — from me. Okay. I appreciate it. The issue in this case is whether record evidence compels the conclusion that the board and the immigration judge erred in concluding the petitioner was not credible. Also, whether the evidence compels the conclusion it's more likely than not that Hernandez would be tortured or buyer at the acquiescence of the government of Guatemala. And finally, whether — Does the torture have to be either by the government or condoned by the government? Has to be either by the government or with the acquiescence of the government. Buyer with the acquiescence. Yes. Which means the government doesn't necessarily have to approve of it, but it has to be in a position to do something and it doesn't do it. Is that what acquiescence means? I think that — I can't remember the exact term. It's — the court has ruled that it can't be blind to it, in other words. Yeah. Okay. Deliberately blind. But the standard isn't quite that the government has to approve of it. Right. Yeah. Okay. In this case, the — it's sort of a different posture coming to the board in its final decision because what happened was initially he was granted asylum based on — political asylum based on his first application to the agency. He subsequently was — had convictions and that was terminated. His asylum was terminated and then he filed a new application for asylum. In his subsequent application for asylum, he raised many issues and facts that were not presented in the first application. It was qualitatively different than the first application. And for those reasons, he did not in the first application, for example, state that he had been gang raped in Guatemala when the intruders who came into his house who were masked demanded evidence — or information about the title to — How clear was our case law at the time of the initial grant, which I think was in 1995, that homosexuality or transgender and so on was a protected category? I can't say that it was clear. But the board in this case did not hold that against him in its final decision. It recognized that a transgender or — that basically he could have realized later on and not when he initially filed his first application that he was gay or transgender and that he could have realized that later on. And so they recognized that this court has, in the asylum context, viewed that as a social group, a particular social group. But there are two different questions. Number one is, when he gets his asylum in the mid-'90s, was it clear that the law would protect him given his transgendered or homosexual status? And the answer is maybe. And the other one is — the point you just made — well, at that time, he might not — and we do know this can be the case — have fully recognized that he is transgendered or bisexual. I'm not quite sure what the term is that he applies to himself. But I have to say the more important question for me is, we have here an adverse credibility finding entered by the second I.J. who refused to hear from him. That bothers me. I mean, if he testified, and then if we had an adverse credibility based on his testimony, when he knew what was at issue — that is to say, he knew he had an I.J. who was likely to disbelieve him on precisely that point. That's a different case for me. Tell me why the I.J. properly acted in saying, I'm not going to hear from you, I'm not going to let you say anything other than what was already in the testimony in the earlier proceeding in which the I.J. was willing to treat you as credible. Okay. I will. I mean, that's my problem with this case. Sure. In the — when he was before the first I.J., he was asked at some point by the immigration judge, why did you not include in your prior application that you were homosexual and had been gang raped? He then added a few more things to that, so that the very end of that question, it's at 418, I believe — granted, it was like a very, very long question, but the end of that question asked, why do you think things happened? So he may not have taken — he may not have answered — What page are you on the record so I can sort of — I'm sorry, 418? Right. Hang on a second. I've got lots of pieces of paper here. All right. And so what — No, no, no. Hang on, hang on, hang on. I want to — I want to read it with you. Okay. Yeah, yeah. Okay. I'm on page 418. Where do I look? Why — well, you talk about being a homosexual and being gang raped, but you didn't mention that last time. See, the thing is, I haven't figured out here, but there are two pieces to your claim. One is political claim. One is your homosexuality. According to everything in 1995, you've never had any problems. You've never mentioned anything about being homosexual. You've never had anything to mention about problems you've had. You've mentioned problems about politics and being political. And then he goes on and answers. So granted, he may not have specifically answered there in this particular exchange, but my point is that later on it went to the board. The board remanded this and said it's the second object of adverse credibility finding. So he knew at that point that there was a question about why he didn't put in his first application that he had been gang raped. Right. Right. And also — And I guess he wanted to respond to that by actually testifying. But he's not allowed to testify. But he had the opportunity because he put in a declaration in which he explained why he did not include in the first application that he was gang raped. And the second explanation was — So put my nose in the declaration that he filed. And this is a declaration that's filed in the second proceeding? Correct. Okay. Where is that? Ben, we're going to take you over time. Don't worry about it. 200. 200? Okay. Hang on, I'm slow. I'm slow. Okay, I'm on. Okay, I've got it. Okay, I've got it. So he is responding in the declaration. Yes, he responds in the declaration. And the — at the — I don't know that — at the end of the first hearing where the immigration judge is talking — Where the immigration judge — I'm sorry, you dropped your voice. Where the immigration judge is talking about his — the way he's going to rule, he mentions that his credibility is at issue. So — Let me ask you something a little different. Yes. Let's suppose hypothetically that we disagree with your position on credibility and find that the credibility determination is not adequately supported. What is your argument without the adverse credibility? Without the adverse credibility, the court should remand for the board to reconsider in terms of whether he — to give him — if they found that his opportunity to explain wasn't sufficient. Let me ask you — They should go back and allow that opportunity. Let me ask you about an aspect of that I can't answer. The BIA decision says at page 6 that the background information, I think they mean the country report, says there's insufficient evidence that the government ignores or collaborates in these crimes or that the government acquiesces in these crimes. I think the basis for that was the evidence that while there is violence against homosexuals and transvestites, there is police action following the violence in the country report. It gives examples such as an investigation following the shooting of five transvestites in June 2005 in Guatemala City. I gather you are waiving the possibility of denial of the petition based on that, and you wish to have it stand or fall on the credibility determination. Is that correct? No, I think there's like a couple parts. Do you understand what I'm saying? As I understood the board, they were saying even if he was telling the God's honest truth on everything and his credibility was fine, he'd still lose because he has not proved that the government participates in or acquiesces in torture of transvestites. I don't think that's quite it. I think the board was, first the board was supposed to look at the totality of the evidence. I'm sorry, you dropped your voice again. The board under the Real ID Act looks at the totality of the evidence. So it looks, in making a torture determination, one of the things it looks at is past persecution. And it also can look at if there's no past persecution. It looks at whether in the country reports there's other grounds. I see. So you think if his story and his credibility really did matter to that outcome, so you think it should get remanded if we're not satisfied with the credibility? Yes. Yes. Okay. Yeah. And, okay. Sorry, I lost my place. So the notice that he had that there were inconsistencies was the immigration judge, first immigration judge, pointing out that he didn't have the gang rape and his sexuality in the first application, although later the board says that he didn't realize that he had sexuality at that time. It makes the sexuality part sort of irrelevant. Could you address the other question I raised with your adversary? There are some things about us that are immutable and obvious to others, such as our race. There are some things about us that are immutable, perhaps, and perhaps obvious to others, sexuality. I'm not sure whether that's immutable or obvious to others. I don't know if it is or not. It's probably a spectrum of sometimes it is, sometimes it isn't. And then there are some things that may be immutable, but they're easily hidden, such as a birthmark on a part of the body usually covered by clothes, and I would have thought that being a transvestite would be like that. You could wear dress at home and pants on the street. Does that matter? I don't think it matters to the Cat claim. If he was doing the reason the board supports cats. So if you'll only be tortured if you do something that it's within your power to do or not do, you still went on Cat. Let me put it this way. Let me suppose hypothetically, and this is not, I'm not suggesting this is true, it's just hypothetical. Guatemala is a place where if a man wears a dress on the street, he's going to be tortured and the government's going to participate or acquiesce. But if the very same man wears pants on the street, he's not going to be tortured. And if some thugs do, because they happen to know he likes to wear a dress at home, the government won't acquiesce and won't prosecute. Is that person entitled to Cat relief? I would be hesitant to jump ahead of the board. I don't think the board specifically addressed that, so I can't address your hypothetical. What I will say is the board has talked about immutability in terms of asylum and withholding, whether it's a particular social group. But a particular social group doesn't really matter for the Cat. You can get a Cat protection whether or not you're a member of a particular social group. So that's as far as I can speak to that. Okay. Okay, we are over. If you want to take a paragraph or two to sum up. Okay. I think the evidence here doesn't compel a different conclusion than the board that Petitioner was not credible. The board pointed out the inconsistencies between the two asylum applications. What was in the first was clearly not in the second. By the time the Petitioner got back to the second immigration judge, he was aware that there were differences and that credibility was going to be an issue. And he had the opportunity, maybe not to testify, but he did put in a declaration that explained why he did not include things in his first application, which the board did consider. And the board considered the country reports. And although there are evidence in the country reports that there's been discrimination and some incident attacks against transvestites or gays, that there is also evidence that they were being investigated in the country reports. And just because it didn't come to conclusion doesn't mean that there wasn't a true investigation. Okay. Thank you very much. Response. Now, we took you up and just slightly over your time. Why don't we give you one minute and see what happens. But we'll make sure you get a chance to say what you need to say. Okay. Thank you, Your Honor. Your Honor, regarding the declaration and the notice that Petitioner had before preparing the declaration, the declaration is well over 12 pages long. It tries to address the totality of the Petitioner's story, not focusing in on any one identified discrepancy. Because the only identified discrepancies below in the original hearing were things about Petitioner's plea in his criminal matter. That was discussed at great length. Also discussed at great length was the nature of Petitioner's sexuality. The other things were glancing mentions that are just part of the totality of the circumstances. And if the Petitioner were on notice, for example, that there was a question about, well, in this one that you say it's political, in the other you say it's family, that could have been more of a focus of why those were not inconsistencies. Because they're not actually inconsistencies. It's the same. Well, it's a classic case in one sense of the story gets better. It's not that inconsistency in the sense of the story starts out that two men raped me and it turns out that there was only one. That's an inconsistency. There's nothing inconsistent between the two stories. It's just that the second story is a lot better because it adds some things that simply weren't there. Correct. And we see that a lot. And it's often a legitimate ground upon which the IAJ can say, I don't believe you. Well, there is case law regarding, you know, are these omissions significant? This isn't analogous to the cases where someone omits details about the very incident that compelled them to leave the country. Or is there a good reason consistent with truth-telling why you didn't mention it the first time around? Correct. Or why it didn't come into, there's no transcript, for example, of his conversation with the person he believed to be an attorney who helped him in 95. Why wouldn't it be, why wouldn't you think somebody is a liar if he came to you and he said, something bad happened to me coming home from work. What happened that was bad? Well, I lost my bus token and I had to buy another. And then the next day he says, I really was irritated coming home from work yesterday. I got mugged and I got beaten up and a mugger stole my wallet. I would think that you might be very skeptical of the mugging story, because when you ask what bad thing happened to you coming home from work yesterday, it wasn't mentioned. It's not logically inconsistent. Why isn't this the same sort of thing? It's not the same sort of thing. It might be more analogous, Your Honor, if the person had said to you, I was assaulted on the way home from work yesterday, and then failed to detail that that assault involved being beaten with a stick, and then later added that it was being beaten with a stick. No, here the first story is I was persecuted for political opinion, and the second story is I was gang raped because of my sexual indications. No, the second story, I want to correct that, Your Honor. There is no statement in the record that my client ever said that he was assaulted because of his sexuality. Now, that is sometimes why some people in these situations of violence are singled out. When everyone is being beaten, they're the person who's raped. Now, that may have had to do with his sexuality, but it was always that this attack was mixed motives, greed, and politics. And he says in his very first asylum application that he was penalized in part for speaking out and saying, hey, these people who are pretending to protect the government, they also are just greedy and stealing from people. And that's exactly what happened to him in the situation where he and his sister were attacked when they were home. That's exactly what his story consistently has been. And he testified to that attack the first time around? The first time around, he testified to being abused by government soldiers or representatives of the government. It's in the asylum officer's report. And the word abuse is, I believe, used in the asylum application as well. So he consistently says that he was abused. He does talk in more detail about the incident that precipitated his departure, which was his being arrested, jailed, and beaten, which happened after the sexual assault. Let me ask you this. I asked the government lawyer the same question. What was the state of the law in 1995 when his original application was adjudicated and when he was given asylum? What was the state of the law with respect to sexual orientation in terms of whether that was a protected category? I'm trying to figure out whether a good lawyer would have said, you know, the law isn't going to help you very much on this one, so we're not going to talk about it. That would exactly have been the case. In fact, as late as 1990, it was the law that if you were homosexual, you were automatically deported. You were not eligible for relief. So as of 1994, about, cases started coming down after 1990. But it would by no means have been clear. When's the first time that the Ninth Circuit has a holding in which we say some form of sexual orientation is a protected category? I believe it was 1994, Your Honor, but I'm not sure. Okay, well, we can find that out. Okay. Thank you. Okay, thank you. Thank both sides for your arguments. Hernandez v. Holder is now submitted for decision. The next case on the argument calendar is Herani v. Bittman.
judges: Hug, Kleinfeld, Fletcher